RECEIVED
MAY 2 5 2011
AT 8:30_____M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
(Trenton Venue)

CIVIL ACTION No. 11-3054

IN RE:
PETITION OF LUDMILA A. TSYMBAL

UNDER FEDERAL RULE OF CIVIL PROCEDURE 27(a)

VERIFIED PETITION

FOR AN ORDER

ALLOWING DEPOSITIONS OF RAISA LUKIN AND TONY LUKIN

Petitioner Ludmila A. Tsymbal respectfully petitions this honorable Court to order the depositions of Raisa Lukin and of Tony Lukin, both residents of Trenton, New Jersey, for perpetuating their testimony in anticipation of future litigation concerning the allegedly concealed inheritance assets, to which the Petitioner has a claim.

Introduction and Parties

Petitioner Ludmila Alexeevna Tsymbal (hereinafter also "Tsymbal") is a Russian citizen residing at the address: 19 Repischeva Street, K. 3, Apt. 112, St. Petersburg, Russia. Petitioner is the sister of Evgeny Lukin, aka Ivanov, who, on information and belief, left after his death in 1982 substantial assets in Switzerland, which are being concealed.

Respondent Raisa Lukin (hereinafter also "Raisa") is a U.S. citizen (formerly a Soviet citizen), residing at: 63 Andrew Street, Trenton, N.J., 08610 and/or 24 Great Andrew Street,

1

Trenton, New Jersey, 08610. She is the widow of Eugene A. Lukin, aka Eugene A. Ivanov. As relevant for purposes of the Rule 27(a) Petition, she is about 79 years old.

Respondent Tony Lukin (hereinafter also "Tony") is a U.S. citizen, residing at: 24 Great Andrew Street, Trenton, N.J., 08610. He is the son of Eugene Lukin and Raisa, and he is Petitioner's nephew.

Pursuing a cause of action to claim the inheritance and assets controlled by the late Lukin, aka Ivanov became possible in 2008. Namely, on December 6, 2007, the Supreme Court of the Russian Federation (by its Military Collegium) made a decision No. 1¬003367p/51. See Exhibit A to the Petition. By virtue of that verdict, the capital punishment, *in absentia,* imposed earlier upon fugitive from military justice Lukin, aka Ivanov was reaffirmed, but it was no longer accompanied by the claim of the confiscation to the State of all his assets.

Upon that judicial decision, it became possible for relatives of Lukin, aka Ivanov, to make their claims to the inheritance and to the assets in his estate, on information and belief, controlled by a trust in Switzerland. However, for the reasons explained in this Petition, information about Lukin's assets in Switzerland has not been ascertained or documented to date.

For the compelling reasons, a deposition of Raisa, who is about 79 years old, should not be postponed until Petitioner or her heirs are able to accumulate information about the Swiss assets, left by Lukin, to bring an adequately documented lawsuit.

Raisa's husband and Petitioner's brother, Eugene Lukin, died in Trenton, New Jersey, on June 13, 1983. On information and belief, he committed suicide. He brought with him the information about the alleged assets in trust in Switzerland. The remaining witness believed to have that information is Raisa, the widow. In the event of her possible death by the reason of age, the claims that would be otherwise available to Petitioner would be forfeited forever.

As a second witness, Tony Lukin is believed to be 56 years old. However, if the deposition of Raisa were to be allowed, it would be appropriate to order a companion deposition of Tony Lukin, i.e. in the interests of justice and for saving resources and costs of the parties.

**FACTS.**

1. <u>Underlying Facts on the Family and the Alleged Inheritance Assets</u>

Eugene Alexeevich Ivanov, aka Eugene Alexeevich Lukin, aka Eugene Lukin was born in 1924 in a village called Andrianov in Stalingrad Region, Russia. As a teenager he was distinguished by a particular hobby, of studying German language.

With reference to Exhibit A, as the Supreme Court of Russia has determined, in July of 1942 Lukin who happened to be on the territory seized by the Nazi troops, voluntarily proposed to the Nazis his services as a collaborator. He was enrolled in a detachment of German police. Thereupon, Lukin served in that capacity until 1944, when the Soviet Army liberated the territory seized by the German Army. During those years under the Nazi occupation, Lukin took part in the reprisals against the local population. The decision in Exhibit A provides the details of his alleged participation in the killings of civilians. See Ibid.

According to the Russian press, during the time of occupation by the Nazis, Lukin amassed a substantial fortune.

Reportedly, Lukin reclaimed under his control the assets of his family. Namely, his grandfather, Pakhom Lukin (on the maternal side), had been a wealthy person who owned substantial real estate in Pskov region (to the East of St. Petersburg). He also owned a horse-breeding ranch, with about 50 racing horses. After the Communist regime was imposed, in 1921 he was shot dead in random executions. His daughter, Maria Lukin (1889-1971), although

unable to retain the family assets, maintained information about those. She married Aleksey Ivanovich Ivanov (who died at war in 1943).

That couple, Alexey and Maria Ivanov (nee Lukin) had 3 children. The elder, Anatoly Ivanov, born in 1921, died at war in 1942. The second was Eugene, born on November 20, 1923 (giving in the U.S. information as if he was born in 1925). The third child of that couple was Petitioner here, Ludmila A. Tsymbal (nee Ivanova), born on March 15, 1927.

According to the Russian press, Lukin, the only surviving male in the family, took control of the family assets, liquidated those and, before the end of the WWII, moved some of those family assets outside of Russia. Namely, during the Nazi occupation, privatization by the Communists of the private assets in Russia was annulled by the German occupation authorities, and it became possible for heirs to reclaim the prior rights of ownership.

Additionally, while being on a member of local police, Lukin was able to amass a fortune from the assets of the locals who were liquidated by the Nazis. At the time, it was customary that local collaborators working for the local police controlled by the Nazis were able to personally profiteer from the confiscation of the assets of the victims of the Nazis.

According to the judicial decisions, the identity of Lukin, aka Ivanov was determined by several witnesses on the photographs, including photographs where he wore a Nazi police uniform. That identity was confirmed, among others, by the present Petitioner, and Respondents reportedly do not deny that Lukin and Ivanov was the same person.

According to the Russian press, Lukin was also involved in dispatching confiscated valuables to Germany and, towards the end of the WWII, to Switzerland. The disclaimer is made that the Petitioner has no documents supporting that version of events.

According to the judicial decisions in Russia, when the German forces were retreating from the Soviet territory in 1944, Lukin fled to Germany. As a collaborator, Lukin would be subject to the capital punishment that a Soviet military tribunal would summarily impose.

According to the Russian judicial decisions, in June of 1945, that same person reemerged in Germany where he started to hold himself out as Lukin, using the name on his maternal line and concealing his past. His adopting the Lukin name appears not to have been incidental, because of the family assets on the material side. Under that assumed identity, Lukin got employed, as a civilian truck driver at the military center of Hagenow, in the neighborhood of Mecklenburgh, Germany, which was then in the Soviet Army's zone of occupation.

According to the judicial decisions, when he was employed as a civilian, in November of 1945 Lukin was enlisted to the Soviet Army. Concealing his true biography, Lukin served, as a private, in the unit that provided the guard protection of the military center in Hagenow.

2.   Lukin Relocating to the USA

According to the judicial decisions, on January 25, 1948 Lukin, then a private in the Soviet Army, was ordered to return to the USSR (for immoral conduct). When the train with those to be repatriated was en route, in Frankfurt-upon-Order Lukin jumped off that train and returned to Hagenow. Lukin hid at his girlfriend's place (Anna Shalau who later testified to that). See Ibid, Exhibit A.

According to the judicial decisions, in early February of 1948 Lukin escaped into the British zone of West Berlin. Later Lukin left for the British zone of occupation of West Germany. Thus, Lukin became a deserter and a fugitive. On May 8, 1948, Lukin was declared wanted in the USSR and in all its zones of occupation in Germany.

On information and belief, sometime after 1948, Lukin went to the USA. Lukin ultimately established residence in Trenton, New Jersey, where he worked as a mechanic. On information and belief, Lukin's whereabouts was subject to official inquiries from Russia.

On information and belief, Lukin concealed his past and refrained from traveling to reclaim the assets he allegedly controlled overseas. Lukin became a U.S. citizen by ca. 1974. The last residential address of Lukin was 63 Andrew Street, Trenton, New Jersey, 08610. His then wife, Raisa is believed to reside at that same address at the present time.

On information and belief, Raisa Lukin (nee Gavrilenko) was born in approximately 1933. Her father allegedly served in the German occupational forces and before the end of WWII left, together with his family including Raisa, for Germany. Ultimately, Raisa's family also ended up in the USA and, on information and belief, ultimately settling in New York area. Subsequently, Lukin and Raisa met and later got married.

On information and belief, son Tony was born to that couple in approximately 1955. He resides at: 24 Great Andrew Street, Trenton, New Jersey, 08610, tel. 609 890 0635.

On information and belief, on or about June 13, 1982 Lukin was found dead in his home in Trenton as a result of strangulation (hanged in his residence, believed to be a suicide). According to Tony, his father was, however, executed by Israeli intelligence Mossad (without the Petitioner's lending credibility to that theory).

3.      Judicial Proceedings in Russia Have Established Facts

As mentioned above, the matter of Lukin, aka Ivanov, was considered by several courts in the Soviet Union and then in Russia.

On September 19, 1951, the Military Tribunal of the division 48240, having considered the matter of Lukin, including eye witnesses' testimony upon the photographs of the person they

identified as Ivanov, sentenced the fugitive in *absentia* to the capital punishment, with a confiscation of all his assets. Then the proceedings concerning Lukin were on and off for a considerable time. Raisa, his wife, was involved in attempting to rehabilitate her husband, and she at least once traveled to the then USSR for that purpose.

On March 16, 2006, Lukin's sentence was considered, yet anew, by the board of the 3rd District Military Court in Russia, which left the sentence without changes. That was subject to a writ of certiorari.

On December 6, 2007, the Supreme Court of the Russian Federation (Military Collegium) entered a decision No. 1003367p/51, which denied reconsideration concerning Lukin, aka Ivanov. See Exhibit A. The matter was heard by judges General Major of Justice Shalakiv A.S., Colonel of Justice Krupnov I.V. and General Major of Justice Kalinichenko Y.A.

Namely, Lukin was still adjudged as a collaborator with the Nazi occupation forces and symbolically subject to the capital punishment. (Russia has suspended indefinitely the executions since 2003). However, the Supreme Court excluded from his sentence the confiscation of all assets of the person convicted *in absentia*. See Ibid, Exhibit A.

At all times relevant hereto, after the end of the WWII, Petitioner was aware of the issues of the alleged inheritance and of the hidden assets. As the last, third child, of the two surviving children of her parents, the Petitioner was entitled to half of the inheritance left by her parents and grandparents, allegedly controlled by Lukin and left after him in trust in Switzerland.

However, documents from the WWII were mostly unavailable. In any event, until the collapse of the Soviet Union by 1992, Soviet citizens had to obtain a permit to travel abroad, and any private investigation into alleged assets in Switzerland was unavailable to her.

Along with the relaxation of the Russian regime in the late 1990s and in the years 2000, Petitioner, through her relatives and agents, attempted to collect information about any dormant accounts left after her brother Lukin. However, other than rumors, such attempts were unsuccessful to yield documents.

The present Petition is eventually the last chance that Petitioner may have to shed light into the family assets and to find out what she is entitled to.

## POINTS OF LAW AND AUTHORITIES

1. <u>Case Law Supports Petition on the Venue and Procedure Employed</u>

As a preliminary issue, this Court has jurisdiction and power to grant relief, to perpetuate evidence. See <u>Martin v. Reynolds Metals Corp.</u>, C.A.9 (Or.) 1961, 297 F.2d 49. It must be shown that in a contemplated action, federal jurisdiction would exist and a matter that may be cognizable in federal court. <u>Dresser Industries, Inc. v. U.S.</u>, C.A.5 (Tex.) 1979, 596 F.2d 1231, rehearing denied 601 F.2d 586, certiorari denied 100 S.Ct. 731, 444 U.S. 1044, 62 L.Ed.2d 730.

Petitioner brings this Petition in the Trenton venue of the U.S. District Court. This could not be more convenient to both potential deponents. See <u>Martin v. Reynolds Metals Corp.</u>, C.A.9 (Or.) 1961, 297 F.2d 49.

Service is expected to be duly affected in Trenton, where the U.S. District Court is located. Testimony may be perpetuated by a proceeding brought in the district of the residence of any expected adverse party. See <u>Petition of Haussler</u>, E.D.N.Y.1950, 10 F.R.D. 134. <u>Shore v. Acands, Inc.</u>, C.A.5 (Miss.) 1981, 644 F.2d 386.

2. <u>Discovery of Assets Allegedly on Swiss Dormant Accounts Is Appropriate</u>

A search of family assets and tracing those to Swiss dormant accounts, left after the WWII, is nothing new. The issue of dormant accounts in Swiss banks, as well as alleged

destruction of banking records reached even U.S. Congress's attention. Reference is made to the Senate's hearings in April of 1996. Ref. the Congress's hearings, chaired by senator D'Amato, at S. Hrg; 104-582.

The Volcker Commission, set up by Congress, established that, based on the number of the provenly opened accounts and of the accounts for which records were missing, over 2.7 million accounts at Swiss Banks remained without documentation. In December of 1996, the Swiss parliament issued an act lifting banking secrecy towards assistance to the Volcker Commission's investigation, but only for five years. That window of opportunity is now foreclosed for Petitioner, and it was unavailable for her as a Russian citizen.

The issue of a forum with regard to dormant accounts at Swiss banks has been a matter of dispute in several class actions in U.S. courts, and such claims were ultimately resolved in the U.S. One court provided a thorough review of the forum. See In re Holocaust Victim Assets Litigation (E.D.N.Y., 2000), 105 F.Supp.2d 139), affirmed (2nd Cir., 2005), 413 F. 3d 183.

3.   Advanced Age of First Respondent and Possibility of Losing Evidence Forever Compels to Allow Her Deposition.

As shown above, the main person to be questioned is Raisa. She is approximately 78 years old. There is a real danger that unless she is deposed, she may be later unavailable for a deposition by reason of deterioration of health or a death from natural causes. At the same time, as mentioned above, the extent of the family inheritance is still unknown to the Petitioner, and unless that deposition is ordered, that information may be lost forever.

Likewise, Petitioner herself is also of an advanced age, namely, 84 years old. Unless she starts the proceedings to obtain a deposition as soon as possible, she may not see the day when her claims could be brought. Petitioner's heirs would get a serious disadvantage of the Petitioner

herself not being available anymore. Courts have considered the issues of age as justification for granting the Rule 27(a) Motion in a variety of circumstances.

The standard for judicial determination under Rule 27 is abuse of discretion by the court. See Penn Mut. Life Ins. Co. v. U.S., C.A.D.C.1995, 68 F.3d 1371, 314 U.S.App.D.C. 320, on remand 1996 WL 33405971. It goes without saying that no appellate review would find abuse of discretion to order to depose a nearly 80-year old person, to perpetuate her testimony. In a case, where a person to be deposed was 80 years old, the court ruled that such an age presented significant risk that he would be unavailable to testify by time of expected trial, and found sufficient grounds for perpetuating his testimony. Ibid, Penn Mut. Life Ins. Co. v. U.S.

Even a lower threshold in terms of the age is sufficient. For example, see Texaco, Inc. v. Borda, C.A.3 1967, 383 F.2d 607. In that case, the denial of leave to take deposition was overturned for abuse of discretion, where a potential deponent was 71 years old, and alleged conspiracy had taken place 11 years previously. In another case, municipalities were entitled to perpetuate testimony of an elderly witness. See In re Town of Amenia, NY, S.D.N.Y.2001, 200 F.R.D. 200. Even where the age is not a factor, a possibility of a possible death (even of a minor) would be considered. See Mosseller v. U.S., C.C.A.2 (N.Y.) 1946, 158 F.2d 380.

Petitioner intends to be a plaintiff in the action ("Petitioner expects to be a party to an action"). See Petition of Ingersoll-Rand Co., S.D.N.Y.1964, 35 F.R.D. 122, 141 U.S.P.Q. 637, on rehearing 35 F.R.D. 568. See Application of Carson, E.D.Ill.1957, 22 F.R.D. 64.

Once a showing is made under Rule 27, liberal construction should apply. See Martin v. Reynolds Metals Corp., C.A.9 (Or.) 1961, 297 F.2d 49. In the event of granting the Petition on the criteria required under Rule 27, Petitioner would then be entitled to a liberal construction of the present Petition and the scope of the requested depositions.

## CONCLUSION.

Therefore, Petitioner prays that the depositions of two witnesses in this District be ordered. In the event the Court would be disposed to order deposition of only Raisa Lukin, the person of an advanced age, Petitioner will proceed with deposing her alone. Petitioner requests such a deposition or depositions be allowed to be video-recorded.

Dated: May. 15, 2011

/s/ *[signature]*

GEORGE LAMBERT (D.C. Bar No. 979327), pro hac vice
LAW OFFICES OF LEONARD SUCHANEK
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 747 7797
E-mail: lawdc10@aol.com